All right, good afternoon, counsel. I'm just first going to note to let you know that Justice Bertani is on this panel. He had something come up, an important family issue that he had to go tend to. So he can't be here right now, but obviously this is all being recorded and he'll be listening to the arguments here in the next few days. So, all right. So, Mr. Golfis, are you ready to proceed? I am, Your Honor. Thank you. Good afternoon. I'm Demetri Golfis. I'm from the Office of the State Appellate Defender and I represent Roberto Carias-Moran. May it please the court, counsel. Your Honors, we've raised two issues in this appeal. The first is whether Mr. Carias' attorneys in the circuit court were ineffective for failing to raise a claim of an unconstitutional pretextual traffic stop. The second is whether those attorneys were ineffective for failing to raise a claim that Mr. Carias did not validly consent to a search of the semi-truck because he was asked in Spanish for permission to climb the truck. Although both of these issues are important, I'm going to focus my argument today on the pretextual stop issue. With that said, if the court has any questions about the consent issue, I'm happy to answer those. Your Honors, my plan today is to make three points. The first is that the Supreme Court of the United States has not foreclosed claims that an alleged administrative traffic stop was actually an unconstitutional pretext to perform crime control without probable cause or reasonable stop to perform drug interdiction or more generally criminal interdiction without probable cause or reasonable suspicion. And then lastly, both plea counsel and post plea counsel were ineffective for not presenting this claim to Mr. Carias and also the trial court. Therefore, we're asking that this court vacate Mr. Carias' guilty plea, order the suppression of the narcotics evidence, and remand for further proceedings. Now in the Wren decision and in decisions subsequent to Wren, such as Indianapolis versus Edmond, the Supreme Court has made clear that if the police want to stop a vehicle to perform crime control, they need to have probable cause or reasonable suspicion. If they have probable cause or reasonable suspicion of criminal activity when making a traffic stop, then courts are not going to inquire into whether the police had an ulterior motive when making the stop. If however, the police do not have probable cause or reasonable suspicion when making a traffic stop, such as when stopping a vehicle to perform an administrative inspection, then the courts can absolutely inquire into whether the police had an ulterior motive. And the reason for that is courts do not want to allow the police to abuse an exception to the warrant and probable cause requirement. They don't want the police to stop vehicles to perform, say, an administrative inspection of a commercial vehicle, but then look for evidence of criminal activity when they don't have probable cause or reasonable suspicion. They don't want pretexts. So for this reason, the Supreme Court has only partially closed the door to claims of pretextual stops. If an administrative stop is a pretext to perform crime control without probable cause or reasonable suspicion, that stop violates the Fourth Amendment. Now, in our case specifically, the record establishes that the state police stopped Mr. Correas allegedly to perform a commercial vehicle inspection, but the record shows that that was a pretext to perform criminal interdiction or drug interdiction without probable cause or reasonable suspicion. First off, we know that these troopers who stopped Mr. Correas were not ordinary state troopers. They were part of a special unit called CRIMPAT, and the record establishes that CRIMPAT, their job description, is to perform criminal interdiction. We have access in the record to their training materials. Their training materials document that they were trained pursuant to the Valkyrie Program, and as this court probably well knows, the Valkyrie Program is a drug interdiction program sponsored by the DEA. We have testimony from the officers in this case at a suppression hearing that the job of CRIMPAT is to identify and apprehend major criminals. That's a quote, major criminals. We also have statistics from CRIMPAT that are part of the record for a two and a half year period from September of 2016 to March of 2019, so that's just a few months, several months before the stop. And what those statistics show is that CRIMPAT seized five tons of drugs in that time period. In contrast to that, CRIMPAT issued less than one traffic citation every four days, and that's CRIMPAT statewide, not just every individual officer that's part of CRIMPAT. One citation every four days. So, the record establishes that CRIMPAT's job is drug interdiction or criminal interdiction. Looking more specifically to the actions of the officers in this case, we know that they were performing criminal interdiction and drug or drug interdiction when they stopped Mr. Karius. We know that because they admitted it. One of the troopers testified that his job that day was to make traffic stops pursuant to the CRIMPAT program. That was his assignment. He admitted that on the record. We know that these officers were assigned to I-80, which is a well-known drug corridor. They had a drug detection dog in the vehicle with them. One of the officers also admitted why they selected Mr. Karius in particular. He testified that they chose Mr. Karius because he stood out from a criminal patrol perspective. They focused on the fact that he had flashy decals, he had an oversized lock. And one thing that I would highlight was these officers also admitted to checking his DOT number as they passed him before they decided to make the stop. And what that DOT number check revealed was that Mr. Karius' truck came back as, quote, one vehicle, one driver. And what that meant was that Mr. Karius' truck did not belong to a company that had a whole bunch of trucks and employed a whole bunch of drivers. It was one person's truck and it was his only truck. And that indicated to these officers that he could potentially be a criminal. Another thing these officers admitted was that when they were in the truck to perform this inspection and talking to Mr. Karius, they were, quote, absolutely looking for, quote, things. And when you look at, when you read the transcripts in the context of that exchange with defense counsel, it's pretty clear that the things that they're talking about are indicators of criminal activity that they were trained to detect. And the officer said that he couldn't see any of those things because the sleeper berth was closed off. Now, part of a level three inspection is not to look for evidence of criminal activity in the tractor of a semi, all right? So when we look at all this evidence as a whole and we consider the legal test for when a traffic stop is an unconstitutional pretext, that test is, was the primary purpose the invalid purpose? Or alternatively, courts ask, would this stop have occurred absent the improper purpose? And both of those tests are satisfied here. For reasons that I've discussed, the primary purpose of this traffic stop was crime control. This stop also would not have occurred absent that purpose. The officers testified that Mr. Correa's semi was one of many semis on the interstate that day. That's an important fact because commercial vehicle inspections are done entirely at random. And when you consider that in conjunction with the fact, the admission that they pulled over Mr. Correa's because he stood out from a crime patrol perspective, the odds that Mr. Correa's would have been pulled over at random that day for a random commercial vehicle inspection, absent a desire to look for criminal activity or more specifically drugs, the odds of that happening are zero or pretty close to zero. So this traffic stop was an unconstitutional pretext, violates the fourth amendment. Finally, relief is warranted due to ineffective assistance to both plea counsel and post plea counsel. Simply put, they both missed this pretextual stop claim. Plea counsel should have raised it in a motion to suppress. He was aware of the factual basis of this claim. All the evidence was before him at the time of the motion hearing. Had he raised it, the motion would have been granted. The evidence would have been suppressed and there would have been absolutely no reason for Mr. Correa's to plead guilty. The state would not have been able to prove him guilty without the narcotics evidence. Plea counsel's ineffectiveness rendered the guilty plea involuntary. There is certainly a case law that holds that where plea counsel is ineffective for failing to argue a suppression claim that would have resulted in the suppression of drugs, that renders guilty pleas involuntary. Turning to post plea counsel, post plea counsel should have raised plea counsel's ineffectiveness for this reason in the motion to withdraw the guilty plea. The record establishes Mr. Correa's wanted his guilty plea withdrawn. Post plea counsel even filed a motion to withdraw. We also know from the record that post plea counsel was aware of the factual basis for pretextual stop claim because the record establishes that he reviewed the part of the record relating to the suppression issues because he mentioned that in his motion to withdraw the plea. For these reasons, we are asking that this court vacate Mr. Correa's guilty plea order of a suppression of the evidence because the record conclusively establishes an unconstitutional pretextual stop and that you remain for further proceedings. With that, I'm happy to answer any questions that the court has. And I just, I think you said this, but correct. Trial counsel at the hearing motion, the motion hearing, put in much of what you were talking about, what crim pad does, what kind of a unit they are and all those things. He did put it in, in the record, correct? He put all that in the record. He, he listed a lot of information I'm relying on here, but he never argued that the stop was unconstitutional. It was an unconstitutional pretext in violation of the fourth amendment. Sure. He didn't spot the, the exception to pretext stops being perfectly fine. Well, that I wouldn't say perfectly fine. Let's, let's say constitutional under our, under our current law, pretextual stops are acceptable. He just didn't know or didn't spot the, the exception to that rule that you're referring to with regard to administrative stops. That's correct, Your Honor. Yes. I can elaborate just a little bit more on that. You know, when you look at the red decision and subsequent decisions from the Supreme Court addressing pretextual stops, you know, if you have, for example, the police want to look for evidence of drugs or a criminal interdiction unit and they stop a vehicle for a traffic violation, Supreme Court says that's, that's fine because if a traffic violation is committed in plain view, they've got probable cause, they've got reasonable suspicion to pull that vehicle over, the fourth amendment is satisfied. But as you, as Your Honor referred to, and as I've argued, when there's no probable cause or reasonable suspicion and you're pulling a vehicle over for an administrative stop, that's different. That's an exception. And you need to be darn sure that the primary purpose of that stop is not something other than an administrative stop. All right, Justice Anderson, do you have any questions? I don't. It's a straightforward case, I think. Right. Is it, you've been, we've both been before, before, before us, before me, before me. I think I called you Ms. Bailon, but is it Bailon? Bailon. Bailon, I was right the first time. Okay, thank you. Go ahead. Counsel, Laura Bailon on behalf of the people. While represented by Mr. Olivero, defendant pled guilty to unlawful possession of controlled substance with an intent to deliver, he was then appointed new counsel, Mr. Hamer, who filed a motion to withdraw a guilty plea, which the trial judge denied. On appeal, defendant is arguing that Mr. Hamer was ineffective for not arguing that Mr. Olivero was ineffective in two ways, but Mr. Hamer was not ineffective because Mr. Olivero was not ineffective. And I would plan to focus on the issue that defendant has focused on today as well. The stop was constitutional, so counsels were not ineffective in failing to raise a meritless issue. The Orozco case discusses what pretext means in the context of an administrative stop of a commercial motor vehicle. In that case, the court emphasized that the presence of a criminal investigatory motive by itself does not render an administrative stop pretextual. Instead, a stop is not only prohibited if it would not have occurred in the absence of the invalid purpose, but a dual motive where one is valid does not render a stop pretextual. A stop is not pretextual based on a mere expectation that incriminating evidence might be found. So courts have declined to adopt a rule that an officer can only conduct an administrative search of a commercial motor vehicle if and only if they have no reason to suspect any possible violation of law. Applying that law to its in Orozco, the court found that the stop of a defendant's truck was impermissible because the only reason for it was a tip from another trucker describing a particular truck with the specific time it would be at a specific location, and only because of that tip did the officer in that case drive to that specific location to seek out that specific truck and pull that specific truck over. Here, by contrast, the officers were on the highway making traffic stops. They didn't seek out defendant. They weren't looking for his truck in particular. They instead stopped him to do a level three inspection because he happened to go by as one of many spot trucks on the road. The stop wasn't pretextual just because the officers had crim-pat training because dual motive stops are permissible, and it's not true that their one and only goal was to look for evidence of drug trafficking. Instead, traffic enforcement is also a goal, and that includes commercial motor vehicle inspections under the motor vehicle safety law. Here, the officer did a level three inspection. He gathered all the paperwork. Defendant who had been stopped for these inspections before said that the troopers asked for what they always asked for. The officer took the information on the computer. It generated the inspection form. The inspection came back clean, so there's no ticket to issue in this case. Then the officer gave the completed form to defendant and told them to mail it in. Where that commercial motor vehicle inspection was a reason for the stop, it was not impermissibly pretextual, and councils weren't ineffective for failing to raise this issue. Are there any questions on either issue? I do not have any. Justice Henderson? No, I don't. All right. Thank you, Ms. Bailon. Mr. Goldfuss, you get the last say. Thanks. Thank you, Your Honor. With respect to the argument that the officers were just out patrolling that day and they did a commercial vehicle inspection because that's part of their job, the record doesn't support that. We know that these were CRIMPAT officers, and the job of CRIMPAT is to seek out major criminals and to perform drug interdiction. We have an admission on the record that their assignment that day was to make traffic stops pursuant to the CRIMPAT program. We have an admission on the record that the reason why they stopped him was because he stood out from a criminal patrol perspective. So to say that they were just out on patrol and they did a commercial vehicle inspection doesn't really jive with the record. With respect to the Orozco decision, counsel tries to distinguish that case by saying that that case involved a tip and a direction from superiors to follow up on that tip to be ready to look for a vehicle that may be coming and may be trafficking narcotics. And while our case doesn't involve a tip, the case doesn't need to involve a tip to be pretextual and to violate the Constitution. If you look at our case, the Orozco decision, and also if you look at Indianapolis v. Edmonds, which is a roadside checkpoint program case where the Supreme Court found that a checkpoint program whose primary purpose was drug interdiction, if you look at all these cases, they have two things that are in common. They all involve officers performing traffic stops pursuant to an assignment. And that assignment is criminal interdiction or drug interdiction. They're not just out on patrol as an ordinary straight trooper would be. They've all been given an assignment and that assignment is criminal interdiction or drug interdiction. And that's true whether it's a roadside checkpoint program, an assignment from a or an assignment from higher ups in Illinois State Police forming a criminal interdiction unit saying, here unit, go out and perform criminal interdiction, go find drugs. Another thing that's in common with all these cases is all these officers are making traffic, they're accomplishing that directive, that assignment, by making traffic stops without probable cause or reasonable suspicion of criminal activity. And if your primary purpose in doing that is crime control, then you're violating the Constitution. That's what was found in Indianapolis v. Edmond by the Supreme Court. That's what was found in Orozco. And that's what should be found here. And unless there are any further questions, I would again ask this court vacate Mr. Crease's guilty plea, order the suppression of the evidence, and remand for further proceedings. And I thank the court. Counselor, I just do have one, I have one question. With regard to consent and this argument that your client couldn't speak English very well, or didn't understand Spanish very well, the trial judge found him to be not credible, right? Yes. What can you offer us to get past that? A credibility finding by the trial judge who saw the testimony. Sure. Ultimately, when you look at a question of consent to search, the inquiry is objective, okay? It's not subjective. So you need to look at what did the officers ask, and what was the defendant's response from an objective standpoint? And he was asked essentially twice for what, for right now, just phrase that as permission to search. He was first asked by the English speaking officer, and the officer phrased it as, I can pull up the exact quote. I think it was something like, I'm going to search, okay? And it sort of technically has a question mark at the end, but maybe not. If I ask you to search, is that okay? And Mr. Crease's response in English was, that's okay. And that's okay is ambiguous. It could mean yes, it could also mean no. So when he answered the question to the English speaking officer, he gave an ambiguous answer. So then let's shift to the Spanish speaking officer. The Spanish speaking officer testifies that I asked him for consent to search, and he says yes. But then defense counsel said, okay, well, what Spanish word did you use? And the Spanish speaking officer said, I used the word escolar, and he spells it out on the record. So it's unmistakable that's the word that he used. And escolar means in Spanish to climb. So objectively, when you look at that, my client was asked for permission to climb his truck. So objectively, you have an ambiguous response and a response to the question of, can I climb your truck? And ultimately it's the state's burden to show by a preponderance of the evidence that there's a valid consent. And I think when you look at those two things, that does not meet that threshold. You have an ambiguous answer and an answer to a question of, can I climb your truck? But even when he was having a conversation in English with the officers, I think according to the video, it looked to the trial judge like they were having, I think the trial judge referred to it as a nice conversation, right? Yes. But ultimately her credibility finding came down to her doubting my client's ability to understand Spanish. My client said he did not understand what the officer meant by escolar. Okay. And she said, well, you're Spanish speaking, you should be able to understand that. But an issue arises when the Spanish speaking officer, who's apparently fluent in Spanish, doesn't know Spanish because he's asking for permission to climb and not to search. So that severely undercuts the judge's credibility finding. She's saying my client is not credible because he doesn't understand Spanish, but he's being asked for permission to climb his truck. So that can be confusing to my client. And I'd also note that as the Spanish speaking officer testified, there are different dialects of Spanish from different countries. And that could very well explain why Mr. Carias was confused by what he was being asked. So again, it's the state's burden to show by a preponderance of the evidence that there's valid consent. And the facts of this case, objectively speaking, don't show that, and they also undermine the judge's credibility finding. Thank you, counsel. Thank you. You know, that came up at the end with the question. I think it's only fair, Ms. Bailon, if you want to just take a minute or two, because you only addressed the issue that he was addressing, and it came up in a question. So the only fairness would dictate you can take a minute or two to respond if you wish. Sure. Concerning the consent issue, the court is not reviewing de novo whether defendant consented or not, but instead whether counsels were ineffective. And the alleged deficient performance here is in not investigating the meaning of the Spanish language used and not arguing that defendant didn't knowingly consent to the search. But Mr. Olivero did both of those things. He asked Officer Castillo what word he used. He asked defendant if he understood that word, and defendant testified that he didn't know what that word meant. And the whole point of his motion to suppress was arguing that defendant didn't consent to the search. So he didn't perform efficiently in failing to take actions he did take. And there's also no showing of prejudice, because for prejudice, the question is whether the trial judge would have granted the motion to withdraw a guilty plea if Hamer had raised the issue that Olivero should have further investigated the Spanish language and argued that defendant did not consent. And the answer to that question is clearly no here, because the trial judge did find that defendant understood English and consented in English. And that's not affected by the argument about the Spanish language. The trial judge found defendant understood English because defendant volunteered while he was testifying that trooper seeks and never told him he could leave. And the trial judge stated that it was important that if defendant didn't understand what's going on, he would not understand he was not told he could go. The trial judge also noted defendant was a CDL holder for eight years. And to get a CDL, a driver must be able to read and write English. And found that the video showed seeks interactions with the defendant and that defendant answered all the questions appropriately. Additional argument over the word escalar wouldn't have made a difference to the ruling on the motion to withdraw a guilty plea because defendant already testified he didn't know what it means. And his credibility would have been further undermined if counsels argued it means climb because defendant said he had no idea what that word was. So you're saying he has no idea what that word was, but now it's asserted it has meaning that's easily understandable. Climb isn't a vocabulary word that's something you need a PhD to understand. So there's no prejudice here also because defendant's own testimony was that he thought wanted to look at it, look things over. And that was after the officers had just asked if he had any marijuana, cocaine, or heroin. So it was clear they were looking for drugs. There's no prejudice in this case. There's no deficient performance in this case concerning the consent issue. And thank you, Your Honor, for allowing me to address that issue. Right. I just want to give you a chance because it came up at the end and we went well over that last part. We're in plenty good time in the big picture, but on the last five minutes, we went well over. So I thought it was only fair. Thank you both for your arguments. We're going to take this matter under advisement and issue a decision in due course.